IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | : | JURY TRIAL DEMANDED |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Civil Action |
| v. | : | No. _____ |
|  | : |  |
| SHAVER FOODS, LLC, and | : |  |
| ZILKA & CO., LLC, | : |  |
|  | : |  |
| Defendants. | : |  |
| | : |  |

_____

## **COMPLAINT**

This procurement fraud case is about the unlawful substitution of diluted spices. Defendant Shaver Foods, LLC ("Shaver Foods") contracted with the Federal Bureau of Prisons to supply spices to federal prisons. To ensure a potent and consistent product, the contracts required Shaver Foods to supply spices containing no additives or fillers. The requirement also affected price: pure spices cost more when they contain no additives or fillers, whereas diluted spices cost less.

Shaver Foods subcontracted with Zilka & Co., LLC ("Zilka"), but recklessly failed to tell Zilka about this important requirement. As a result, Zilka supplied the prisons with spices diluted by vast amounts of cheap additives and fillers—some by as much as 70 percent. Shaver Foods demanded that the prisons pay for pure spices, resulting in overcharging and false claims. Zilka independently caused Shaver Foods to submit these false claims, because Zilka's spices contained more filler than necessary to serve any legitimate commercial purpose and deviated from industry custom, regardless of the contract specification.

## PARTIES

1.      Plaintiff United States of America brings this action arising from contracts entered into by the Federal Bureau of Prisons ("BOP"), an agency that houses and feeds federal inmates throughout the country. The agency enters into contracts with food suppliers to meet the inmates' nutritional needs, consistent with its constitutional and statutory obligations.

2.      Defendant Shaver Foods is an Arkansas limited liability company with a principal place of business in Fayetteville, Arkansas. Shaver Foods is primarily in the business of distributing food goods to recipients with institutional needs such the BOP.

3.      Defendant Zilka is a Pennsylvania limited liability company with its primary manufacturing facility in Allentown, Pennsylvania, and an additional location in Hunker, Pennsylvania. Zilka manufactures, packages, and ships spices and other food items to institutions throughout the United States.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331, 1345, and 1355.

5.      The BOP contracted with Shaver Foods to supply spices to prison facilities located across the country, including in the Eastern District of Pennsylvania.

6.      Shaver Foods, in turn, subcontracted with Zilka to supply the BOP with the diluted spices described in this complaint. Zilka manufactured all of the spices described in this complaint within the Eastern District of Pennsylvania.

7.      Venue is therefore proper in this district under 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a).

## BACKGROUND

### Food fraud involves diluting or substituting products for economic gain.

8.      Food fraud, or the act of defrauding buyers of food for economic gain, has appeared in the food industry throughout history.

9.      The earliest reported cases of food fraud date back thousands of years, involving olive oil, tea, and spices.

10.     Most food fraud cases involve the substitution of a high-value product with a less expensive or lower quality alternative. Such cases include cheaper products mislabeled as extra virgin olive oil from Italy, wild Alaskan salmon, caviar, or spices.

11.     All of these products—spices, in particular—continue to be associated with fraud in the food industry. For example, trade groups have reported economic adulteration of food products by adding coffee husks to dilute cinnamon or nutmeg, or by adding starch or maltodextrin to dilute spices at the grinding stage.

12.     To protect victims from this type of food fraud, trade groups have encouraged buyers to adopt written specifications to ensure that they receive only the spices required under a contract, without economic adulteration.

### The BOP relies on its food suppliers to comply with contract specifications.

13.     The BOP has approximately 185,000 prisoners in custody at any given time. The BOP's food services mission is to provide healthy, nutritious, and appropriate meals that meet the needs of the general population and those at nutritional risk.

14.     In 2016, the BOP served approximately 170 million meals, or about 466,560 meals per day and nearly 3.3 million meals per week.

15.     Because the BOP serves such a large volume of meals, the agency relies upon the integrity of its food suppliers to ensure that they supply food that meet the agency's specifications.

3

16.     The BOP utilizes a quarterly reverse bid process to purchase most of the food needed to conduct its mission. Generally, each BOP institution issues a request for quotation ("RFQ") for food supplies for a future calendar quarter by posting the RFQ online. The RFQ lists all of the food items the institution anticipates needing for an upcoming quarter.

17.     The RFQ provides specifications for food items and asks vendors to provide bid prices for each one. Vendors such as Shaver Foods often supply their bids on the RFQ list in handwritten form.

18.     When submitting their bids, vendors agree that they will "only tender for acceptance those items that conform to the requirements of this contract." 48 C.F.R. § 52.212-4.

19.     BOP institutions select from among the bidding vendors and award contracts to the winning vendor. Winning vendors are generally those who offer the lowest price for the items meeting the BOP's specifications. The BOP routinely awards contracts to multiple vendors to supply only a portion of the items listed in the RFQ.

20.     The BOP formalizes a purchase order that transfers the vendor's prices from the bid sheet, thus forming a contract.

21.     The vendor supplies the items to the BOP and then tenders an invoice to demand payment under the contract.

22.     Upon receiving the vendor's invoice, the agency makes an electronic payment pursuant to the contract and vendor's invoice.

**The BOP's contract specifications required spices to contain no additives or fillers.**

23.     Since at least 2017, the BOP has included a specific and conspicuous specification requiring vendors to supply spices containing no additives or fillers—in effect, spices that are 100 percent pure.

24.     Under this specification, spices supplied to the BOP must be "[p]ure—no additives, extenders, foreign matter, or flow agents."

25.     This specification appears on each line item number for each spice in the RFQ.

26.     The specification appears again in the awarded contract, and vendors must comply with it because they "shall only tender for acceptance those items that conform to the requirements of this contract." 48 C.F.R. § 52.212-4.

27.     The specification protects the BOP from unlawful substitution or economic adulteration of spices, ensures that the agency receives a quality product, and promotes consistency across a large institution responsible for meeting inmates' nutritional needs.

28.     In addition, the specification protects inmates who have food allergies by ensuring that the BOP knows the precise ingredients of each product.

29.     As discussed below, as early as 2017 and continuing through today, Shaver Foods and Zilka knowingly supplied diluted spices to BOP institutions.

**Shaver Foods and Zilka substituted garlic powder containing additives and fillers under a contract with FCI Williamsburg.**

30.     On November 13, 2017, the Federal Correctional Institution Williamsburg ("FCI Williamsburg"), in Salters, South Carolina, posted Solicitation Number 15B31618R00006 to www.fbo.gov for various food items for its quarterly subsistence.

31.     The BOP sought to purchase 2000 pounds of garlic powder in pure condition containing "no additives, extenders, foreign matter, or flow agents."

32.     On December 8, 2017, Shaver Foods proposed to supply garlic powder meeting this specification for $3,160, as shown below:



33.     Three other companies bid against Shaver Foods to supply the garlic powder to FCI Williamsburg, but Shaver Foods was the lowest bidder and therefore won the contract.

34.     On August 29, 2017, the BOP awarded purchase order 15B31618PTA130109 to Shaver Foods for the company to supply the garlic powder to FCI Williamsburg.

35.     Consistent with the RFQ, the purchase order required Shaver Foods to supply garlic powder that was in pure condition with "no additives, extenders, foreign matter, or flow agents"—an important requirement that protects the BOP from economic adulteration.

36.     Shaver Foods subcontracted with Zilka, a food supplier with its manufacturing site in Allentown, Pennsylvania, to supply the garlic powder to the BOP under the contract.

37.     Shaver Foods did not communicate any of the contract specifications to Zilka, including the one that required the garlic powder to be in pure condition with "no additives, extenders, foreign matter, or flow agents."

38.     Zilka confirmed that it knew nothing about the contract specification for spices, as shown in the exchange below with an investigatory agent:

```
20      MS.  ███  :  Did Shaver ever give you or

21  Zilka and Company the Bureau of Prisons

22  contract specifications for any of the spices

23  that they bought from you?

24      MR. ZILKA:  No.  Never.
```

39.     If Shaver Foods had communicated this contract specification, then Zilka would have charged Shaver Foods a higher price because pure spices, without additives or fillers, are more expensive.

40.     On January 17, 2018, Shaver Foods delivered the garlic powder it had acquired from Zilka to FCI Williamsburg.

41.     The label attached to the package described the contents as "Garlic Powder" with "Ingredients: Garlic." The label and ingredient list disclosed no additives or fillers, giving the appearance that the garlic powder complied with the BOP's specifications:



42.     Shaver Foods thereafter demanded a $3,160 payment from the BOP.

43.     On February 13, 2018, FCI Williamsburg paid Shaver Foods' invoice for the garlic powder.

44.     Meanwhile, in response to complaints to BOP about ineffective and tasteless spices, the Department of Justice Office of the Inspector General ("DOJ OIG") launched an investigation into the spice supply.

45.     On August 6, 2018, the DOJ OIG obtained a sample of the garlic powder that Shaver Foods had supplied.

46.     The DOJ OIG submitted this sample to the United States Food and Drug Administration (FDA) Forensic Chemistry Center for analysis.

47.     The FDA compared the Shaver Foods garlic powder with two commercially available alternatives manufactured by Kroger and McCormick.

48.     The FDA concluded that Shaver Foods had supplied garlic powder containing mostly food additives instead of garlic. In a report dated November 14, 2018, the FDA found a food additive, maltodextrin, at levels vastly inconsistent with commercially available samples of garlic powder:

| Table 1  Enzyme hydrolysis results | Total Hydrolyzable and Native Glucose * | Total Native Glucose * |
|---|---|---|
| Sample 1082230 Item 1 | 73% ± 21%(w/w)  (n=3)** | less than 4%(w/w)  (n=3) |
| Comparison Kroger Garlic Powder | less than 4%(w/w)  (n=3) | less than 4%(w/w)  (n=3) |
| Comparison McCormick Garlic Powder | less than 4%(w/w)  (n=3) | less than 4%(w/w)  (n=3) |

* Based on Hydrolyzed Maltodextrin Standard
**(Average ± ~95% Coverage Probability)

49.     The garlic powder was mostly something else—a cheap food additive that merely added volume.

50.     Shaver Foods' garlic powder (shown in the middle) was so diluted by the food additive that it appeared significantly lighter in color compared to commercially available garlic powder obtained from two other sources (shown on the left and right):



**Shaver Foods and Zilka substituted cinnamon, cocoa powder, and garlic powder containing additives and fillers under a contract with FCC Butner.**

51.     Shaver Foods and Zilka did the same thing to the Federal Correctional Complex Butner ("FCC Butner"), in Butner, North Carolina.

52.     On December 3, 2018, FCC Butner issued solicitation 15B10619Q1900002 for various food items for its quarterly subsistence, including 500 pounds of cinnamon, 200 cases of cocoa powder, and 500 pounds of garlic powder.

53.     The RFQ required bidders to supply each item as "Pure – no additives, extenders, foreign matter, or flow agents."

54.     On December 14, 2018, Shaver Foods proposed to sell FCC Butner 500 pounds of cinnamon for $740; 200 pounds of cocoa powder for $278; and 500 pounds of garlic powder for $785, each of them in pure condition with "no additives, extenders, foreign matter, or flow agents," as shown below:



37. Two other companies bid against Shaver Foods to supply these spices to FCC Butner (except for the cinnamon), but Shaver Foods was the lowest bidder and won the contract.

38. On or about December 19, 2018, Shaver Foods entered into purchase order 15B10619PUA120148 to supply all three spices to FCC Butner.

55. Consistent with the RFQ and Shaver Foods' bid, the purchase order required Shaver Foods to supply the spices to FCC Butner in pure condition with "no additives, extenders, foreign matter, or flow agents."

56. On or about January 17, 2019, Shaver Foods subcontracted with Zilka to supply the cinnamon, cocoa powder, and garlic powder to FCC Butner.

57. Shaver Foods did not communicate any of the contract specifications to Zilka, including the one that required the spices to be "Pure, no additives, extenders, foreign matter, or flow agents."

58. If Shaver Foods had communicated the contract specifications, then Zilka would have charged Shaver Foods a higher price because pure spices, without additives or fillers, are more expensive.

59. On February 5, 2019, Shaver Foods supplied FCC Butner with 498 pounds of cinnamon, 200 pounds of cocoa powder, and 498 pounds of garlic powder under purchase order

15B10619PUA120148, all of which the company had purchased through Zilka. (The BOP subsequently modified its contract with Shaver Foods to reflect the shortfall of 2 pounds of cinnamon and 2 pounds of garlic powder.)

60.     The label attached to the packages described the contents as cinnamon, cocoa powder, and garlic powder as the sole, exclusive ingredients. The label and ingredient list identified no additives or fillers, giving the appearance that the spices complied with the BOP's specifications.

61.     On or about March 8, 2019, Shaver Foods demanded a $1,796.90 payment from FCC Butner.

62.     On March 21, 2019, FCC Butner paid Shaver Foods for the spices.

63.     Again acting upon the earlier complaints, the DOJ OIG obtained samples of the cinnamon, cocoa powder, and garlic powder that Shaver Foods had supplied to FCC Butner.

64.     Investigatory agents submitted this sample to FDA Forensic Chemistry Center for analysis.

65.     The FDA concluded that the garlic powder sample contained a food additive, maltodextrin, at levels inconsistent with commercially available samples of garlic powder. The food additives comprised nearly half of the garlic powder supplied by Shaver Foods:

Table 1:  Estimated Oligosaccharide content in Item 1 and the comparison garlic powder

|  | Total Hydrolyzable and Native Glucose * | Total Native Glucose * |
|---|---|---|
| Item 1 (Suspect garlic powder) | 46% ± 11%(w/w) ** | less than 3%(w/w)  (n=3) |
| Kroger GARLIC POWDER (Comparison) | less than 3%(w/w) | less than 3%(w/w)  (n=3) |

* Based on hydrolyzed maltodextrin standard
** Results are reported as the average ± the uncertainty with ~95% coverage probability, n = 3.

66.     Shaver Foods' garlic powder (shown on the left) was so diluted by the food additive that it appeared significantly lighter in color compared to commercially available garlic powder (shown on the right):



67.     Additionally, the FDA concluded that the cinnamon was not consistent with commercially available cinnamon. The same food additive comprised more than half of the cinnamon supplied by Shaver Foods:

**Table 2:  Estimated Oligosaccharide content in Item 2 and the comparison cinnamon**

|  | Total Hydrolyzable and Native Glucose * | Total Native Glucose * |
|---|---|---|
| Sample 1101130 Item 2 (Cinnamon) | 55% ± 13%(w/w)  (n=3)** | less than 3%(w/w)  (n=3) |
| Kroger CINNAMON (Comparison) | less than 7%(w/w)  (n=3) | less than 3%(w/w)  (n=3) |

\* Based on hydrolyzed maltodextrin standard
\*\* Results are reported as the average ± the uncertainty with ~95% coverage probability.

68.     Similar to the garlic powder, Shaver Foods' cinnamon (shown on the left) was so diluted by food additives that it appeared significantly lighter in color compared to commercially available cinnamon (shown on the right):



Shaver Foods   Comparison
Cinnamon

69.     Finally, the FDA concluded that the cocoa powder was not consistent with

commercially available cocoa powder, observing that a food additive—maltodextrin or simple

flour—comprised nearly half of the cocoa powder supplied by Shaver Foods:

Table 3:  Estimated Oligosaccharide content in Item 3 and the comparison cocoa powder

|  | Total Hydrolyzable and Native Glucose * | Total Native Glucose * |
|---|---|---|
| Sample 1101130 Item 3 (Cocoa powder) | 49% ± 12%(w/w)  (n=3)** | less than 3%(w/w)  (n=3) |
| HERSHEY'S COCOA (Comparison) | 12% ± 3%(w/w)  (n=3)** | less than 3%(w/w)  (n=3) |

* Based on hydrolyzed maltodextrin standard
** Results are reported as the average ± the uncertainty with ~95% coverage probability.

70.     Using a microscope for magnification, these photos compare the cocoa powder

supplied by Shaver Foods (shown at the left) with commercially available cocoa powder (at the

right). The lighter foreign additives stand out in the Shaver Foods product:



Shaver Foods
Cocoa Powder

Comparison
Cocoa Powder

**Shaver Foods and Zilka substituted garlic powder, cumin, and chili powder containing additives and fillers under a contract with FCI Gilmer.**

71.     Shaver Foods and Zilka repeated the same conduct under its contract with the Federal Correctional Institution (FCI) Gilmer in Glenville, West Virginia.

72.     On May 29, 2019, FCI Gilmer posted solicitation number 15B11919Q00000019 on the FedBid web site for various food items for its quarterly subsistence, including garlic powder, cumin, and chili powder.

73.     The RFQ required bidders to supply each item as "Pure – no additives, extenders, foreign matter, or flow agents."

74.     On or around June 12, 2019, Shaver Foods proposed to sell FCI Gilmer 1200 pounds of garlic powder for $3,564; 300 pounds of cumin for $891; and 500 pounds of chili powder for $1,485, each of them in pure condition with "no additives, extenders, foreign matter, or flow agents" as shown below:

Pure - no additives, extenders, foreign matter, or flow agents.

| | | | | |
|---|---|---|---|---|
| Spices, Garlic, Powder. From dehydrated garlic bulb ground to a fine powder after the milling process. 100% air dried garlic. Appearance and Flavor Cream Brown Fine Powder with the characteristic odor and flavor of garlic. No off notes. Texture - A dry medium fine granular powder, slightly fibrous. Moisture less than 12%. Packaging must indicate actual delivered weight of product. Pure - no additives, extenders, foreign matter, or flow agents. 1/2 oz to 50 lb sealed plastic containers or boxes. Note package size on bid. | LB | 1200 | $2.9700 | $3,564.00 |
| Spices, Cumin, Ground. (CID A-A-200018, Type I, Class I, Form 1). Packaging must indicate actual delivered weight of product. Pure - no additives, extenders, foreign matter, or flow agents. 1/2 oz to 50 lb sealed plastic containers or boxes. Note package size on bid. | LB | 300 | $2.9700 | $891.00 |
| Spices, Chili Powder, Ground. Packaging must indicate actual delivered weight of product. Pure – no additives, extenders, foreign matter, or flow agents. ¼ oz to 50 lb sealed plastic containers or boxes. Note package size on bid. | LB | 500 | $2.9700 | $1,485.00 |

75.     Two other companies bid against Shaver Foods to provide the spices, along with various other items, to FCI Gilmer. Although the competitors bid less than Shaver Foods for the individual spices, Shaver Foods' total price was lower when combined with the other items in the solicitation.

76.     On June 26, 2019, Shaver Foods entered into purchase order 15B11919PUA110259 to supply these spices to FCI Gilmer.

77.     Consistent with the RFQ, the purchase order required Shaver Foods to supply the spices to FCI Gilmer in pure condition with "no additives, extenders, foreign matter, or flow agents."

78.     On July 15, 2019, Shaver Foods subcontracted with Zilka to supply the spices to FCI Gilmer.

79.     Shaver Foods did not communicate any of the contract specifications to Zilka, including the one that required the spices to be in pure condition with "no additives, extenders, foreign matter, or flow agents."

80.     If Shaver Foods had communicated the contract specifications, then Zilka would have charged Shaver Foods a higher price because pure spices, without additives or fillers, are more expensive.

15

81.     On August 1, 2019, Shaver Foods supplied FCI Gilmer with 1200 pounds of garlic powder, 300 pounds of cumin, and 500 pounds of chili powder via shipment from Zilka.

82.     The label attached to the packages described the contents as garlic powder, cumin, and chili powder as the sole, exclusive ingredients. The label and ingredient list identified no additives or fillers, giving the appearance that the spices complied with the BOP's specifications.

83.     On August 15, 2019, FCI Gilmer received an invoice from Shaver Foods demanding payment of $5,940 for the spices.

84.     On August 19, 2019, FCI Gilmer paid Shaver Foods for the invoice.

85.     Acting upon the earlier complaints, the DOJ OIG obtained samples of the garlic powder, cumin, and chili powder that Shaver Foods had supplied to FCI Gilmer.

86.     Investigatory agents submitted this sample to FDA Forensic Chemistry Center for analysis.

87.     The FDA concluded that the samples of garlic powder, cumin, and chili powder contained the same food additive, maltodextrin, at levels inconsistent with commercially available samples used for comparison:

Table 2: Results for Item 2

|  | Total Hydrolyzable and Native Glucose[1,2] (%, w/w) | Total Native Glucose[1] (%, w/w) |
|---|---|---|
| Sample 1121420 Item 2 (cumin) | 48 ± 4 | less than 3.1 |
| Kroger CUMIN GROUND | less than 3.1 | Not analyzed |

[1] Based on Hydrolyzed Maltodextrin Standard
[2] (Average ± ~95% Coverage Probability)

Table 3: Results for Item 3

|  | Total Hydrolyzable and Native Glucose[1,2] (%, w/w) | Total Native Glucose[1] (%, w/w) |
|---|---|---|
| Sample 1121420 Item 3 (chili powder) | 33 ± 3 | less than 3.1 |
| Kroger CHILI POWDER | less than 4 | Not analyzed |

[1] Based on Hydrolyzed Maltodextrin Standard
[2] (Average ± ~95% Coverage Probability)

Table 4: Results for Item 4

|  | Total Hydrolyzable and Native Glucose[1,2] (%, w/w) | Total Native Glucose[1] (%, w/w) |
|---|---|---|
| Sample 1121420 Item 4 (garlic powder) | 58% ± 5 | less than 3.1 |
| Kroger GARLIC POWDER | less than 3.1 | Not analyzed |

[1] Based on Hydrolyzed Maltodextrin Standard
[2] (Average ± ~95% Coverage Probability)

88.     A side-by-side comparison of the samples from FCI Gilmer to their commercially available counterparts showed color differences because of the dilution by additives and fillers. In the following photos, the spices from Shaver Foods appear in the top row (lighter color), and the commercially available samples appear underneath in the bottom row (darker color):



89.     Several years after entering into the contracts, in May 2020, Shaver Foods still had not told Zilka about the BOP's specifications for spices, demonstrated by the following exchange with an investigatory agent:

17

8      MS. ███████: Okay. So as of right now,

9  today, do you know whether or not today that

10  spices furnished to the Bureau of Prisons need

11  to be 100 percent pure without additives.

12      MR. ZILKA: I do not know that.

13      MS. ███████: Okay. Was that because

14  Shaver Foods never passed that information on

15  to you?

16      MR. ZILKA: They never passed it on to me.


### COUNT I
### (False Claims Act: Presentation of False Claims)
### 31 U.S.C. § 3729(a)(1)(A)
### Defendants Shaver Foods and Zilka

90.     The United States repeats and re-alleges the allegations contained in all

paragraphs above, as if fully set forth herein.

91.     Between at least 2017 and the present, Shaver Foods and Zilka knowingly

presented and/or caused to be presented materially false and fraudulent claims for payment to the

BOP in violation of the False Claims Act by supplying spices that contained additives and fillers,

contrary to the contract specifications.

92.     The False Claims Act defines "knowingly" to mean that a defendant "(1) has

actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C.

§ 3729(b).

93.     By enacting the False Claims Act, Congress expressed its desire "to reach all

types of fraud, without qualification, that might result in financial loss to the government."

*United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968). Thus, a false claim "may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specifications, statute or regulation." S. Rep. No. 99-345 at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

94.     The False Claims Act applies to those who submit false claims to the Bureau of Prisons, as well as those who cause someone else to submit the false claims. Subcontractors are the classic example: "It is settled that the [False Claims] Act . . . gives the United States a cause of action against a subcontractor who causes a prime contractor to submit a false claim to the Government." *United States v. Bornstein,* 423 U.S. 303, 309 (1976).

95.     Shaver Foods knew about the specification that required it to supply spices without additives or filler, but recklessly failed to communicate it to Zilka. The specification appeared conspicuously and repeatedly throughout in the BOP's solicitation underlying each contract. Shaver Foods wrote its price next to the specification for each spice when the company submitted its bids. The specification also repeated itself in the BOP's national menu, a compendium of food specifications that Shaver Foods knows well.

96.     Shaver Foods signed RFQ bid sheets certifying that it would tender items that conformed to the requirements of the contract. The RFQ bid sheets included the requirement that the spices be "pure–no additives, extenders, foreign matter or flow agents."

97.     Shaver Foods knowingly presented false claims for payment for spices that complied with the BOP's specification, because Shaver Foods recklessly ignored the specification and never communicated it to its subcontractor who manufactured the spices. *See* Declaration of Michael Ferrara, attached as Exhibit 1.

98.     Shaver Foods demanded full payment from the BOP for spices that failed to comply with the contract specification, knowing that it had not told its supplier about the specification in the first place.

99.     The BOP's specification was important to ensure that suppliers did not dilute spices, like Zilka did.

100.    Shaver Foods could not reasonably have asked Zilka to supply spices by name without including the specification. The specification was necessary to prevent economic adulteration by diluting the spices—a fraudulent practice in the food industry throughout history.

101.    Shaver Foods' request to supply spices by their name alone, such as "garlic powder," failed to convey the BOP's specification and left the prisons vulnerable to economic adulteration of food.

102.    Shaver Foods acted recklessly, at a minimum, by promising to comply with a contract specification that it did not bother to communicate to the subcontractor who supplied the spices to the government.

103.    Shaver Foods' false claims were material to the BOP's payment for the food items, and the agency would not have purchased the spices from Shaver Foods under the purchase orders if it had known about the dilution.

104.    Zilka, as the subcontractor, caused Shaver Foods to submit these false claims by diluting its spices with vast amounts of cheap food additives that deviated from industry custom and practice and served no commercial purpose, regardless of the contract specification.

105.    Legitimate processing or packaging requirements cannot explain the high volume of maltodextrin contained in Zilka's spices.

20

106.    Economic adulteration of the spices—i.e., the intentional dilution to maximize profit—is the only reasonable explanation for such high levels of filler.

107.    Moreover, Zilka disclosed no additives or fillers on the product labels, creating a false impression that the spices complied with the BOP's specifications.

108.    Shaver Foods and Zilka caused the BOP to overpay for spices and award contracts unfairly, undermining the integrity of the federal procurement process.

109.    Shaver Foods and Zilka are similar to the contractors whose conduct prompted Congress to enact the False Claims Act more than 100 years ago. During the Civil War, contractors often supplied the government with items that failed to comply with specifications: "For sugar, it often got sand; for coffee, rye; for leather, something no better than brown paper; for sound horses and mules, spavined beasts and dying donkeys; and for serviceable muskets and pistols, the experimental failures of sanguine inventors or the refuse of shops and foreign armories." *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 722 F. Supp. 607, 609 (N.D. Cal. 1989) (quoting 1 F. Shannon, The Organization and Administration of the Union Army, 1861-1865, at 5456 (1965) (quoting Tomes, *Fortunes of War*, 29 Harper's Monthly Mag. 228 (1864))). Diluted spices are a modern equivalent of this age-old practice.

110.    By reason of the conduct above, the United States is entitled to three times the amount by which it was damaged, plus a civil penalty of not less $11,665 and not more than $23,331 for each false claim that Shaver Foods submitted. *See* 85 Fed. Reg. 37004 (2020).

## COUNT II
### (False Claims Act: Making or Using False Records)
### 31 U.S.C. § 3729(a)(1)(B)
### Defendants Shaver Foods and Zilka

111.     The United States repeats and re-alleges the allegations contained in all paragraphs above, as if fully set forth herein.

112.     Shaver Foods and Zilka knowingly made, used or caused to be made or used, false records or statements to get the false claims identified above paid or approved by the BOP.

113.     Specifically, Shaver Foods knowingly made, used or caused to be made or used false invoices and bid proposals to get the BOP to award it contracts and to pay the false claims described above, knowing that it had not communicated any of the contract specifications to Zilka.

114.     Zilka knowingly made, used or caused to be made or used false labels for the spices that failed to reveal maltodextrin as a significant—and sometimes primary—ingredient.

115.     By reason of the conduct above, the United States is entitled to three times the amount by which it was damaged, plus a civil penalty of not less $11,665 and not more than $23,331 for each false claim that Shaver Foods submitted. *See* 85 Fed. Reg. 37004 (2020).

## COUNT III
### Breach of Contract
### Defendant Shaver Foods

116.     The United States re-alleges and incorporates by reference all Paragraphs of this complaint set out above as if fully set forth herein.

117.     The BOP's purchase orders with Shaver Foods required the company to supply spices that contained no additives or fillers.

118.     This specification was a material contract term that repeated itself throughout the RFQs, bids, purchase order, and national menu for the BOP.

119.    The specification affected both the price and quality of spices. Deviation from the specification undermined the fairness of the competitive bidding process.

120.    Shaver Foods supplied spices that failed to conform to the BOP's specification.

121.    By reason of Shaver Foods' breach, the United States suffered damages in an amount to be determined at trial.

**COUNT IV**
**Payment by Mistake**
**Defendant Shaver Foods**

122.    The United States re-alleges and incorporates by reference all Paragraphs of this complaint set out above as if fully set forth herein.

123.    This is a claim for the recovery of monies paid by the United States to Shaver Foods as a result of mistaken understandings of fact.

124.    The United States paid Shaver Foods for spices that it believed to be "pure–no additives, extenders, foreign matter or flow agents." Instead, the spices had been diluted with undeclared filler ingredients.

125.    The United States made these payments without knowledge of material facts and under the mistaken belief that the Shaver Foods was entitled to receive payment for such claims when it was not.

126.    The United States' mistaken beliefs were material to its decision to pay Shaver Foods for such claims.

127.    Accordingly, Shaver Foods is liable to make restitution to the United States of the amounts of the payments made in error to them by the United States.

## COUNT V
## Unjust Enrichment
## Defendants Shaver Foods and Zilka

128.    The United States incorporates by reference all Paragraphs of this complaint set out above as if fully set forth herein.

129.    This is a claim for the recovery of monies by which Shaver Foods and Zilka have been unjustly enriched during the relevant time period at the expense of the United States.

130.    By directly or indirectly obtaining government funds to which it was not entitled, Shaver Foods and Zilka were unjustly enriched, and are liable to account for and pay as restitution such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## PRAYER FOR RELIEF

Plaintiff United States of America prays for judgment against Shaver Foods and Zilka as follows:

a.    As to the False Claims Act, 31 U.S.C. § 3729(a) causes of action in Counts I and II, against Defendants Shaver Foods and Zilka, for treble the amount the United States' single damages to be proven at trial, plus civil penalties as are required by law in the amount of $11,665 and not more than $23,331 per violation of the False Claims Act, post-judgment interest, costs;

b.    As to Count III (breach of contract) against Defendant Shaver Foods, for the amount of damages sustained by the United States as a result of its Shaver Foods' breach of the contracts with the BOP, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

c.    As to Count IV (payment by mistake) against Defendant Shaver Foods, for the amount of damages sustained by the United States as a result of its payment by

mistake, to be proven at trial, plus pre-judgment and post-judgment interest, and costs;

d.      As to Count V (unjust enrichment), against Defendants Shaver Foods and Zilka, for the sums by which Shaver Foods has been unjustly enriched, to be proven at trial, plus pre-judgment and post-judgment interest, and costs; and

e.      Such other relief as the Court deems just, necessary and proper.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

s/ Gregory B. David
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

s/ Charlene Keller Fullmer
CHARLENE KELLER FULLMER
Assistant United States Attorney
Deputy Chief, Civil Division

s/ Michael S. Macko
MICHAEL S. MACKO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106
Ph:    (215) 861-8415
Fax:   (215) 861-8618
Michael.Macko@usdoj.gov
*Attorneys for the United States of America*

Dated:  August 25, 2020